[Crim. No. 8822. In Bank. Feb. 9, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND FORREST TRELOAR, Defendant and Appellant.

Ollie M. Marie-Victoire, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant was convicted on 13 counts of first degree robbery (Pen. Code, §§ 211, 211a), two counts of kidnaping for the purpose of robbery without bodily harm (Pen. Code, § 209), and one count of murder committed during one of the robberies (Pen. Code, § 189). The jury fixed the punishment at death on the murder count. The court sentenced defendant to prison for the term prescribed by law on the robbery and kidnaping counts and to death on the

murder count. On a prior appeal, we affirmed the judgment on the issue of guilt but reversed on the issue of penalty. (*People* v. *Treloar*, 61 Cal.2d 544, 550 [39 Cal.Rptr. 386, 393 P.2d 698].) On retrial the jury again fixed the penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

The facts with respect to the commission of the crimes were summarized in our former opinion and need not be repeated. (*People* v. *Treloar, supra*, 61 Cal.2d at pp. 545-546.)

 After he was arrested and taken to the police station, defendant was questioned intensively. Two complete confessions, in which he gave full details concerning the robberies and the murder, were solicited by the police and were introduced into evidence against him at the trial on the issue of guilt and at the subsequent penalty trials.

 Confessions are not admissible if they were obtained when "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he waived these rights." (*People* v. *Dorado*, 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361]; *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].) It is conceded that at no time was defendant advised of these rights before he gave the confessions. The confessions should therefore have been excluded.

In *In re Spencer*, 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33], and *People* v. *Polk*, 63 Cal.2d 443 [47 Cal.Rptr. 1, 406 P.2d 641], we held that by virtue of *Linkletter* v. *Walker*, 381 U.S. 618, 622 [85 S.Ct. 1731, 14 L.Ed.2d 601], footnote 5, a defendant may invoke *Escobedo* to attack a final judgment on the issue of guilt in a subsequent proceeding relating to penalty, if the judgment on the issue of guilt was not final when *Escobedo* was decided and if the defendant had no opportunity to raise the constitutional issue at trial and on appeal. The judgment against defendant on the issue of guilt did not become final until 30 days after it was affirmed by this court on July 14, 1964, approximately three weeks after *Escobedo* was decided. Under the law applicable at the time the appeal was briefed and argued, no question could have been raised on *Escobedo* grounds. Defen-

dant did not waive his *Escobedo* claims by failure of counsel to call the attention of this court to the significance of that case by supplemental brief or petition for rehearing in the few weeks between the decision in *Escobedo* and the time our judgment became final. Under the circumstances, defendant did not have a realistic opportunity to invoke the *Escobedo* case in his earlier appeal. There was not, therefore, such a deliberate bypassing of orderly state procedures as would justify a denial of collateral relief in the federal courts (see *Fay* v. *Noia*, 372 U.S. 391, 438, 439 [83 S.Ct. 822, 9 L.Ed.2d 837]), and here, as in the *Polk* and *Spencer* cases, our practice on collateral attack compels the granting of relief.

Since the violation of *Escobedo* compels reversal of the judgment on the issue of guilt on all counts,[1] the judgment on the issue of penalty must necessarily be reversed.[2]

Other questions remain that may arise on retrial.

[1] The Attorney General contends that because defendant cross-examined only sixteen of the thirty-six prosecution witnesses and cross-examined those sixteen only briefly, because he did not testify and did not call any witnesses on his behalf, and because he waived argument to the jury, his conduct at the trial on the issue of guilt amounted to a ''slow plea of guilty,'' making applicable our decision in *In re Seiterle*, 61 Cal.2d 651 [39 Cal.Rptr. 716, 394 P.2d 556]. In that case we said that ''we need not consider whether the confession was improperly obtained under the rules announced in recent decisions. . . . Assuming that Seiterle's confession was obtained in violation of those rules, it was not used to convict him; his conviction was based on his plea of guilty.'' (*Id.* at p. 657.) The Attorney General cites no authority for his novel contention, and we find no merit in it. A plea of guilty is ''the equivalent of a conviction of the crime. [Citations.] It amounts to an admission of every element of the crime charged. [Citations.] Thus after a plea of guilty properly received the prosecution is under no duty to prove that [defendant] committed the crime.'' (*People* v. *Jones* (1959) 52 Cal.2d 636, 651 [343 P.2d 577].) After a plea of guilty a defendant may not question the admissibility of evidence (*In re Seiterle, supra*). Such consequences do not ensue, however, when a plea of not guilty has been entered. Defendant did not waive the right to challenge the confessions on *Escobedo* grounds merely because the conduct of his defense was not as vigorous as perhaps it might have been.

[2] The judgment on the issue of penalty would have to be reversed even if such reversal were not compelled by the reversal of the judgment on the issue of guilt. In his argument to the jury the district attorney asserted several times that a primary consideration for the jury was the right of society to protection. He contended that ''in 1950 and up to 1957 defendant was subjected to the rehabilitative processes of the state prison system, the Department of Corrections, and was he rehabilitated in 1962? If that is the kind of rehabilitation there is, I think the word should have its meaning changed in the dictionary. [I]f the type of rehabilitation they had back in those days was as effective as it appeared on this defendant, anything would be better. But how much better?'' He stated to the jury that if it felt that life imprisonment, ''carrying with it the availability of rehabilitation, will not accomplish its purpose, then . . . the death penalty is the appropriate penalty.'' In discussing opinion evidence introduced by defendant on the

At the retrial on the issue of penalty the prosecution introduced police testimony describing statements made by defendant before he was brought to the police station for booking. These statements were not offered at the trial on the

---

question of rehabilitation, the district attorney went on to argue: "[T]he stakes are too high for possibilities. I don't want to gamble like that and you . . . should likewise not want to gamble. I want probabilities. . . .

"There is nothing that can be done with him that hasn't been tried and proved unsuccessful. If you want to try it again, the gamble is too great. Nobody has come forward and said that defendant probably would be rehabilitated . . . the odds are too long. . . . I don't like that gamble."

In *People* v. *Morse*, 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], we disapproved of prosecution attempts to "emphasize to the jury the possibility of error by the Adult Authority and the potential grievous harm that might result from the inadvertent parole of a defendant convicted of murder." (*Id.* at pp. 638-639.) We stated that "The function of the jury is to consider the facts surrounding the crime and the defendant's background, and upon that basis, reach its decision. The jury should not be invited to decide if the defendant will be fit for release in the future; it should not at all be involved in the issue of the time, if any, when the defendant should be released; it should not be propelled into weighing the possible consequences of the Authority's administrative action." (*Id.* at p. 643.)

We also stated in *Morse* that the jury is "entitled to weigh psychiatric and other testimony as to [defendant's] susceptibility to rehabilitation and reformation," but we admonished that the jury "should not . . . attempt to appraise whether at some future date the Adult Authority may improperly release the defendant or speculate as to when he might be released." (*Id.* at p. 647.) Thus, the *Morse* case distinguishes argument directed at the possibility of defendant's rehabilitation, which is proper, from argument that emphasizes the possibility of defendant's release, which is improper. The concern of the jury is whether or not defendant is fit to live, not with whether society is to be "protected" from hypothetical erroneous decisions of the parole authorities in the future.

The arguments set out above are strikingly similar to those we disapproved on defendant's first appeal (*People* v. *Treloar*, 61 Cal.2d 544, 548 and fn. 2 [59 Cal.Rptr. 386, 393 P.2d 698]) as tending "to invite [the jury] to impose the death penalty in order to prevent the Adult Authority from mistakenly paroling defendant while he remained a danger to society." There, as here, the prosecutor stressed the "gamble" of rehabilitation, the need to "protect society" and the past failure of the authorities to rehabilitate defendant. This time, the prosecutor merely avoided using the words "parole" or "Adult Authority." Once again, however, he attempted to convince the jury that the Adult Authority could not be trusted to protect the interests of society and might some day release defendant, even if he were not rehabilitated. The references to the "Department of Corrections" and its previous dealings with defendant, make it clear that the "gamble" that the jury was to reject was not that defendant might not be rehabilitated, but the possibility that "potential grievous harm . . . might result from the inadvertent parole of a defendant convicted of murder." The argument was not merely a "rhetorical device" as the Attorney General contends, but constituted an appeal to the jury to assume the responsibility of the Adult Authority and "decide if the defendant will be fit for release in the future. . . ."

issue of guilt, but they may be offered on a retrial of that issue.

Defendant was arrested in Los Angeles on March 27, 1962. As the arresting officer reached to disarm him, defendant exclaimed, "You have the right man" and "This is the gun I had." These remarks will be referred to as defendant's first statement. In the police car, he initiated a conversation with one of the officers. He volunteered that had the police been a few minutes late in arresting him he would not have been caught, as he was planning to leave for South America. He asked how long Rivard, the murder victim, had lived. These remarks will be referred to as defendant's second statement. The officer replied and then asked, "What happened to the guy [the victim] in Farah's bar?" Defendant responded that "he tried to be a hero," and, when requested to explain, continued, "the guy wouldn't do what he was told." These remarks will be referred to as the third statement.

These three statements are admissible. When they were made, three of the four conditions of *Escobedo* and *Dorado* necessary to attain the vital accusatory stage had been met, but the condition that the statements be the result of a "process of interrogations that lends itself to eliciting incriminating statements" (*People* v. *Stewart*, 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Dorado*, *supra*, 62 Cal.2d at p. 353; *Escobedo* v. *Illinois*, *supra*, 378 U.S. at p. 491) had not been met. The test whether a prohibited process of interrogations has been undertaken is objective. "Whatever may be the subjective intent of the interrogators, we must . . . analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (*People* v. *Stewart*, *supra*, at p. 579.) As we explained in *In re Lopez*, 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], the United States Supreme Court in *Escobedo* "sought to eliminate conditions which invited coerced confessions"; it "sought primarily to prevent police tactics which, in the past, have spawned involuntary confessions." (62 Cal.2d at pp. 372-373.) In *People* v. *Cotter*, 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862], we pointed out that an analysis of *Escobedo, Dorado,* and *Stewart, supra,* makes it clear that those cases were primarily aimed at preventing police officers from employing "inquisitorial techniques in seeking to prove the charge

against the accused out of his own mouth." (63 Cal.2d at p. 393.) The facts of the cases decided by this court that compelled reversal under *Escobedo* demonstrated that the police had attempted a process of sustained and accusatory inquiries, resulting in active, if sometimes subtle, pressure upon the accused to incriminate himself.

It is evident that defendant's first statement, made immediately upon his arrest, was entirely spontaneous and in no way elicited by the police. Defendant's second statement was also spontaneous. The third statement was given in response to an officer's question, but the circumstances under which the statement was made were unlike the "total situation" in the *Escobedo* case and the cases following it in four crucial respects: (1) defendant had been in police custody for a few minutes only and was in the process of being promptly taken to the police station; (2) the questioning was initiated by defendant, and the statement was volunteered in response to a neutral inquiry invited by defendant's own remarks; (3) the conduct of the police was neither intimidating nor accusatory, nor did it appear in any way designed to elicit incriminating statements; (4) defendant had virtually confessed in his earlier statements. There was thus no inquisitorial pressure, subtle or blunt, asserted against defendant and designed "to prove the charge against the accused out of his own mouth." (*People* v. *Cotter, supra,* at p. 393.)

Other questions raised are not likely to arise on retrial.

The remittitur issued in Crim. No. 7352, *People* v. *Treloar,* 61 Cal.2d 544 [39 Cal.Rptr. 386, 393 P.2d 698], is recalled and the judgment of the Supreme Court of July 14, 1964, vacated. The judgment appealed from is reversed in its entirety.

Peters, J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J.,* Dissenting.—Before we can tenably reach the result decreed by the majority a critical question appears to be: Do we have multiple causes before us or only a single "entire cause"? The issue is critical because it is jurisdictional. Only if we view this case as presenting multiple "causes" to be severally determined, each without bene-

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

148

fit of the record in the other, can we find color of constitutional authority to reverse.

To begin with it is noted that the Supreme Court of California is a court of limited jurisdiction. The sole source of our relevant power is article VI of the state Constitution. That article measures the grant and defines its limits as follows: ''The Supreme Court shall have appellate jurisdiction on appeal from the superior courts . . . on questions of law alone, in all criminal cases where judgment of death has been rendered; . . . (Cal. Const., art. VI, § 4.)

''No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' (Cal. Const., art. VI, § 4½.)

In my view of the law we have before us only one action. The state is plaintiff-respondent; Treloar is the defendant-appellant.

We are not triers of fact but, for the limited purpose of determining whether a miscarriage of justice is shown, we must consider the evidence which the jury heard and the ultimate facts which they found, together with the rulings which the trial court made. In view of the presumption of innocence at the trial, the jury must have been instructed to that effect, but on appeal after conviction the rule changes. If the record shows any substantial evidence to support the judgment the presumption is in favor of the judgment. (See *People* v. *Daugherty* (1953) 40 Cal.2d 876, 885 [5] [256 P.2d 911], and the authorities there cited, rejecting the contrary statements in *People* v. *Lamson* (1934) 1 Cal.2d 648, 661 [36 P.2d 361], and *People* v. *Staples* (1906) 149 Cal. 405, 425-426 [86 P. 886].)

In *People* v. *Redrick* (1961) 55 Cal.2d 282, 289 [10 Cal. Rptr. 823, 359 P.2d 255], a unanimous court reiterated these propositions which are fundamental to our appellate review: '' [4] The credence and ultimate weight to be given the evidence of the various particular circumstances are of course for the trier of fact, and 'It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. [5] If the circumstances reasonably justify the trier of fact's findings, the opinion of

the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' *(People* v. *Robillard* (1960), *ante,* pp. 88, 93 [1, 2] [10 Cal.Rptr. 167, 358 P.2d 295].)

"[6] The rule that 'to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion' *(People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49 [3] [286 P.2d 1] ; *People* v. *Bender* (1945) 27 Cal.2d 164, 174-175 [1, 2] [163 P.2d 8]) is primarily for the guidance of the trier of fact. Such rule would be applicable to appellate review of a conviction only where, giving to each circumstance in evidence all the legal effect toward guilt which it could support, it would still appear that a rational conclusion of innocence was not excluded. . . .''

In view of the record before us, and of the above delineated constitutional limits of our jurisdiction, I find no tenable basis for the majority's holding that "violation of *Escobedo* compels reversal of the judgment on the issue of guilt on all counts." As appears from the above quoted mandate of our Constitution, no judgment on the issue of guilt can be lawfully reversed by this court unless it shall have found "after an examination of the entire cause, including the evidence . . . that the error complained of has resulted in a miscarriage of justice."

The mere fact that in a potential death penalty case the determination of guilt and penalty are now by statute recognized as presenting in certain circumstances severable issues for some purposes (see Pen. Code, § 190.1) does not mean that the criminal action proliferates into more than one "entire cause." Before the Legislature amended Penal Code section 190 and added section 190.1 in 1957 (Stats. 1957, ch. 1968, p. 3509, §§ 1, 2; see also Stats. 1959, ch. 738, p. 2727, § 1) this court, in the interests of efficiency and expedition of justice,[1] had itself innovated the procedure as an incident in the "entire cause." *(People* v. *Green* (1956) 47 Cal.2d 209, 232-234 [302 P.2d 307].)

The entire cause is now before us and it is upon the complete record that defendant must seek reversal and that we must rest our decision.

[1]To avoid needless delay and aggravation of burden upon both an accused and the state which would flow from reopening the entire cause as to all issues because of error affecting only one.

In demanding reversal defendant necessarily presents to us that which is unfavorable as well as that which may tend to support his claim. Mere basic fairness to the People of California requires that we consider the plaintiff's claims for affirmance as solicitously as those of defendant for reversal.

Examination of the record, including the retrial of the penalty phase, discloses that no "miscarriage of justice" can properly be found if we abide by the constitutional and decisional law above quoted. The record shows (and the majority state) : "Defendant was arrested . . . on March 27, 1962. As the arresting officer reached to disarm him, defendant exclaimed, 'You have the right man' and 'This is the gun I had.' . . . In the police car, he initiated a conversation with one of the officers. He volunteered that had the police been a few minutes late in arresting him he would not have been caught, as he was planning to leave for South America. He asked how long Rivard, the murder victim, had lived. . . . The officer replied and then 'asked, 'What happened to the guy [the victim] in Farah's bar?' Defendant responded that 'he tried to be a hero,' and, when requested to explain, continued, 'the guy wouldn't do what he was told.' '' The majority properly hold "These three statements are admissible." The majority should further hold that these quoted statements, in the context of independent evidence and the related physical facts establishing defendant's guilt of some 16 felonies including the murder during a robbery, are so overwhelming in demonstration of guilt that any question as to the voluntary character of further statements made by defendant is immaterial.

In *Escobedo* v. *Illinois* (1964) 378 U.S. 478, 491-492 [84 S.Ct. 1758, 12 L.Ed.2d 977], the majority opinion by Mr. Justice Goldberg makes clear that the court did not overrule *Crooker* v. *California* (1958) 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448]. The opinion points out that in *Crooker* the court rejected the absolute rule that every state denial of a request to contact counsel is an infringement of the constitutional right *without regard to the circumstances of the case.* In its place the following rule was announced: " [S]tate refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits, [citation], but also if he is deprived of counsel for any part of the pretrial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very

concept of justice.' *Lisenba* v. *California* (1941) 314 U.S. 219, 236 [62 S.Ct. 280, 86 L.Ed. 166]. Cf. *Moore* v. *Michigan* (1957) 355 U.S. 155, 160 [78 S.Ct. 191, 2 L.Ed.2d 167]. The latter determination *necessarily depends upon all the circumstances of the case.*'' (Italics added.)

This court in recent months has repeatedly followed the constitutional avenue of reason left open in *Escobedo*[2] rather than a penal theory of automatic reversal which appeared to have been a trend in earlier cases in this state. Thus, in the late case of *People* v. *Jacobson* (1965) 63 Cal.2d 319 at page 329 [46 Cal.Rptr. 515, 405 P.2d 555], speaking through Mr. Justice Mosk, the court clearly stated the issue (''We turn, therefore, to the question whether the introduction of the statements obtained in violation of defendant's right to the assistance of counsel was reversible error'') and at page 333 concluded by applying our constitutional rule of reason (''After an examination of the entire cause, including the evidence, we are of the opinion that there is no reasonable possibility that the errors complained of might have contributed to the conviction. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171].)'')

Likewise in *People* v. *Cotter* (1965) 63 Cal.2d 386, 396 [46 Cal.Rptr. 622, 405 P.2d 862], Mr. Justice Burke for the court wrote: ''It is noteworthy that in *Escobedo, Dorado* and *Stewart*[3] the defendants were denying complicity and the police were openly accusing them and urging them to tell the truth. By contrast, here the defendant was merely asked to state what had happened. He was not being accused of a crime which he had previously denied committing, which was the case in *Escobedo, Dorado* and *Stewart*, but in fact was asked concerning a crime which he had already freely admitted having committed.

''Neither this court, nor the United States Supreme Court, has ever taken the position that the desire of a guilty man to confess his crime should be stifled, impeded, discouraged, or hindered in any way. The contrary is true.''

'' . . . . . . . . . . . .

---

[2] *Escobedo* v. *Illinois* (1964) *supra*, 378 U.S. 478.

[3] *Escobedo* v. *Illinois* (1964) *supra*, 378 U.S. 478, *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97].

"[P. 397-398] *Escobedo, Dorado* and *Stewart*[4] are also to be distinguished from the case at bench in that in none of them was the court confronted with the problem here presented of determining the legal effect of receiving in evidence a series of confessions and statements, some of which were made during the investigatory phase and were properly received and others of which were given during the accusatory stage and were improperly considered.

"Such a problem was before the court in the recent case of *People* v. *Jacobson, ante,* [63 Cal.2d] p. 319 [46 Cal.Rptr. 515, 405 P.2d 555]. There, the improperly obtained statements were held to be merely cumulative, and since they occurred last in sequence it was held that they could not give rise to an implication that the legally obtained confessions were 'induced' by any subsequently improperly obtained. (*People* v. *Jacobson, supra,* at pp. 330-331.) Under such circumstances this court held that there is no reasonable possibility that the illegally obtained confessions contributed to the conviction. (See also *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171].)

"Similarly, applying the test prescribed in *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243], we find that there is no reasonable probability that a result more favorable to the defendant would have been reached here had the illegally admitted confessions not been received in evidence. (Cal. Const., art. VI, § 4½.)" See also *People* v. *Mitchell* (1966) 63 Cal.2d 805 [48 Cal.Rptr. 371, 409 P.2d 211], wherein Mr. Justice McComb for a unanimous court, reviewed the defendant's several claims of error, and applied the cited rule of article VI, section 4½.

When this case was first before us we considered the evidence on the issue of guilt and held (*People* v. *Treloar* (1964) 61 Cal.2d 544, 546 [39 Cal.Rptr. 386, 393 P.2d 698]): "Treloar does not question the sufficiency of the evidence to support the jury's determination of guilt nor does he otherwise question that phase of the case. It is likewise our conclusion, based upon our independent search of the record (see *People* v. *Ives,* 17 Cal.2d 459, 462 [110 P.2d 408]), that the issue of guilt was properly determined by the jury."

Nothing whatsoever is shown in the record now before us which would support a conclusion on the guilt phase con-

---

[4]*Escobedo* v. *Illinois* (1964) *supra,* 378 U.S. 478; *People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338; *People* v. *Stewart* (1965) *supra,* 62 Cal.2d 571.

trary to that which we formally declared when we filed the cited decision on July 14, 1964. Furthermore, the additional record now here makes still more certain the guilt of this defendant and the implicit integrity and justice of the jury's verdict as to penalty.

Complying with the duty imposed upon us by the same Constitution which grants our power, I have examined ''the entire cause, including the evidence'' and I am not ''of the opinion that [any] error complained of has resulted in a miscarriage of justice.''

Accordingly, I would affirm the judgment in its entirety.

McComb, J., and Burke, J., concurred.

Respondent's petition for a rehearing was denied March 9, 1966. Mosk, J., did not participate therein. McComb, J., Burke, J., and Schauer, J.,* were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.